AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20) ☐ Original ☐ Duplicate Original

LODGED
CLERK, U.S. DISTRICT COURT
09/14/2026
CENTRAL DISTRICT OF CALIFORNIA
BY: GSA DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT
9/14/2026
CENTRAL DISTRICT OF CALIFORNIA
BY: ts DEPUTY

United States of America

v.

Michael Young,

Defendant

Case No. 2:26-mj-05411-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about the date of December 13, 2023, in the county of Los Angeles in the Central District of California, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/S/ Casey Tilton*
*Complainant's signature*

Casey Tilton, Special Agent, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: September 14, 2026

*Judge's signature*

City and state: Los Angeles, California

Hon. Stephanie S. Christensen, U.S. Magistrate Judge
*Printed name and title*

AUSA: Kerry Quinn (#5423)

# AFFIDAVIT

I, CASEY TILTON, being duly sworn, declare and state as follows:

## I. INTRODUCTION

1. I am a Special Agent with the FBI and have been so employed since April 2021. I am currently assigned to the Public Corruption Squad of the Los Angeles Division in the Central District of California and have been since August 2021. During my career as an FBI Special Agent, I have participated in numerous criminal investigations, and I have received both formal and informal training, regarding bribery, embezzlement, money laundering, honest services mail and wire fraud, and related conspiracies. Prior to my work as an FBI Special Agent, I received a master's degree in business administration with a focus on finance and business strategy.

2. I am submitting this affidavit in support of a complaint and arrest warrant for MICHAEL YOUNG for a violation of 18 U.S.C. § 1343 (wire fraud).

3. I am working on this investigation with federal agents from the Internal Revenue Service – Criminal Investigative Division ("IRS-CI"). The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated

otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

4. On April 10, 2026, the Honorable Patricia Donahue issued warrants to search MICHAEL YOUNG's residence (which he shares with his wife and family), residences of other subjects, and the business office of Home at Last Community Development Corporation ("HAL" or "Home At Last"), which is a homeless housing organization YOUNG founded and runs. These warrants were executed on April 13, 2026.

## II. SUMMARY OF PROBABLE CAUSE

5. A joint investigation of the FBI and IRS-CI has revealed probable cause to believe MICHAEL YOUNG (with others) engaged in a years'-long scheme to defraud the City of Los Angeles (the "City"), the County of Los Angeles (the "County"), and other public entities providing funding for homeless housing, including through programs administered by the Los Angeles Homeless Services Authority ("LAHSA").

6. The scheme is complex, involving fake documents and impersonated vendors and millions of dollars of fraudulent billing, but the crux involves secretly-affiliated companies YOUNG set up to look like independent, third-party companies used to bill LAHSA for services supposedly provided at Home At Last sites. In this way, YOUNG was able to circumvent prohibitions on self-dealing in government contracts and requirements for grantees of public funding to go through a required third-party procurement process to ensure grantees, and by extension LAHSA and taxpayers, were paying market price for

large subcontracts. Instead of going through the required procurement process, YOUNG steered large multi-million-dollar contracts to secretly-affiliated companies, and he submitted fake and misleading documents to LAHSA to make it seem like the companies were independent, third party companies, and that HAL had gone through the required procurement process and obtained multiple bids from third-party vendors for these contracts. But the bids, it turns out, were fake, and the procurement process was a sham designed to justify the selection of the secretly-affiliated companies. Behind the scenes, and unbeknownst to LAHSA, YOUNG was paying himself millions of dollars of public funding in prohibited self-dealing transactions, and through the scheme, misappropriating millions of dollars of taxpayer money.

7. YOUNG has been in the homeless housing industry for more than a decade, and he grew to be one of the larger homeless housing provers in south Los Angeles. Through his organization Home At Last Community Development Corporation ("Home at Last" or "HAL"), YOUNG entered into numerous contracts with public entities to provide housing for people experiencing homelessness or at risk of experiencing homelessness – providing this housing at numerous sites throughout Los Angeles, with a focus on sites in south Los Angeles. Through these contracts, he received more than $118 million of public funds for homeless housing from a variety of taxpayer-funded sources, including LAHSA, the City, the County, the United States Department of Housing and Urban Development ("HUD"), and other grantors, including more than $75 million from LAHSA alone. Of this, investigators currently

estimate YOUNG misappropriated more than $7.5 million through the sham vendor scheme under investigation.

8. More specifically, bank records show YOUNG used millions of dollars of public funding to enrich himself at taxpayer expense, including using over $670,000 for personal expenses, which itself included over $48,000 for a trip to Tahiti and over $140,000 remodeling a vintage Chevrolet Impala. YOUNG also funneled millions in public funds into businesses unrelated to homeless housing, including spending over $1 million to open and operate a nightclub and restaurant / lounge in Inglewood called SIX SEVEN FIVE LOUNGE and a next-door bingo hall gambling business (and purported nonprofit) called HOUSE BINGO. YOUNG also diverted over $500,000 of public funding for costs related to acquire, maintain, upkeep, or improve commercial properties unrelated to homeless housing.

9. YOUNG lied repeatedly throughout the course of the scheme. Among other misrepresentations, YOUNG falsely represented in contracts with LAHSA that the money he obtained from LAHSA would be used exclusively for homeless housing or to pay vendors associated with homeless housing programs, when YOUNG instead used this money for his own personal enrichment and to fund businesses unrelated to homeless housing. And, as referenced above, YOUNG also lied to LAHSA about payments being made to third party vendors for homeless housing services, falsely making it appear that the vendors were independent, third-party companies (run by different people) and transactions with these companies were being conducted at arms'-length and at

fair market value, when in reality YOUNG was using these sham vendors as fronts to hide self-dealing transactions that LAHSA never would have allowed (or would have scrutinized far more closely) had it known the true facts.

10. To conceal the fraud, YOUNG submitted fake bids using the names, addresses, and phone numbers of real companies (that were supposedly competitors of the secretly-affiliated companies) to make it appear these companies had bid on contracts to provide services at HAL sites (in response to purported Requests for Proposals ("RFPs") that HAL had supposedly sent out soliciting these bids), but again, the bids from these companies were fake, and the real vendors' identities were stolen to make it seem like HAL's secretly-affiliated vendors were the lowest-priced and most competitive options. YOUNG also sent LAHSA misleading contracts that HAL had supposedly executed with the secretly-affiliated companies again making it appear the companies were run by unaffiliated individuals, but the signatures of these individuals were forged on the documents submitted to LAHSA. YOUNG further submitted misleading invoices from the secretly-affiliated companies, supposedly billing HAL for services provided by those companies, when YOUNG was really billing and paying himself.

11. In addition to the misrepresentations about the ownership of the secretly-affiliated companies, YOUNG also misrepresented the background, operating history, and overall legitimacy of the sham vendors. That is, at least some of the secretly-affiliated companies were not operated as legitimate

businesses insofar as they had no employees or physical locations; they had no customers or clients other than HAL; they did not pay payroll, payroll taxes, or any other taxes; they did not conduct any business in their own names (having no accounts with relevant vendors or loans or lines of credit); and a substantial portion of the funds HAL transferred to these companies was withdrawn in cash in suspiciously structured cash withdrawals or used for YOUNG's personal expenses or business expenses unrelated to the business of homeless housing. That is, it appears that, rather than being legitimate companies, at least some of the sham vendors were set up as shell entities to funnel money back to YOUNG.

12. The secretly-affiliated companies include vendors supposedly in the business of providing catering and housekeeping services at HAL sites, including businesses named SABLE ENTERPRISES LLC ("SABLE"), C&C CATERING, and BLEU DIAMOND SERVICES INC. ("BLEU DIAMOND").

## III. STATEMENT OF PROBABLE CAUSE

### A. Public Records and Evidence from LAHSA and the County

13. According to public records, Home at Last is a Los Angeles-based non-profit organization, co-founded by YOUNG in 2002.

14. According to HAL's website and other public information, HAL holds itself out as a non-profit organization dedicated to ending homelessness by providing housing, case management, and supportive services to individuals, families,

and transitional-aged youth experiencing homelessness or at risk of experiencing homelessness.

15. HAL is registered with the California Secretary of State ("CA SOS"), and according to the most recent CA SOS filing from January 5, 2026, YOUNG's wife is listed as HAL's CEO. Previous filings list YOUNG as CEO, and LAHSA records and other evidence indicate that YOUNG runs the organization with others.

16. According to documents and other information obtained from LAHSA and the County:

a. HAL entered numerous contracts with LAHSA to provide homeless housing services at various sites in Los Angeles, with a focus on sites in south Los Angeles. HAL's contracts with LAHSA date back to at least 2019, but it appears HAL has been receiving homeless housing funding dating back to at least 2010 and potentially earlier.

b. HAL's LAHSA-funded sites include or have included:

i. Avalon Carver Community Center, 4920 Avalon Boulevard, Los Angeles, California 90011 ("Avalon");

ii. Matrix (Broadway), 8770 South Broadway, Los Angeles, CA 90003 ("Matrix"),

iii. Evolve (Van Nuys), 6909 Sepulveda Boulevard, Van Nuys, CA 91405 ("Evolve");

iv. LIV (Central), 5100-5108 South Central Avenue, Los Angeles, CA 90011 ("LIV");

v. Animo Inglewood / Manchester site, 3425 Manchester Boulevard, Inglewood, CA 90305 ("Manchester");

vi. Bryant Temple AME, 5500 S. Hoover Street, Los Angeles, CA 90037 ("Hoover");

vii. Alondra Park, 3535 Redondo Beach Boulevard, Torrance, CA 90501 ("Alondra Park");

viii. Vermont, 5165-5171 S. Vermont Avenue, Los Angeles, CA 90037 ("Vermont");

ix. Western, 8311 S. Western Avenue, Los Angeles, CA 90047 ("Western"); and

x. MLK Motel, 1758 W. Martin Luther King Jr Boulevard, Los Angeles, CA 90062 ("MLK").

c. LAHSA funding for at least some of these sites dates back to 2021 or earlier, in connection with contracts: AD-BH-BH-035 (Avalon - Bridge Housing), AD-BH-RIH-004 (Evolve – Bridge Housing), AD-BH-RIH-012 (LIV), AD-BH-RIH-013 (Matrix – Bridge Housing), AD-CH-AWS-003 (Alondra Park – Augmented Winter Shelter), AD-CH-CH-052 (Avalon – Crisis Housing), AD-CH-CH-069 (Vermont – Crisis Housing), AD-CH-WS-004 (Vermont and Western – Winter Shelter), AD-CH-WS-006 (Hoover – Winter Shelter), AD-CH-WS-021 (Matrix – Winter Shelter), AD-PD-PS-050 (Avalon – Youth Problem Solving), AD-RRH-RR-005 (Manchester – Recovery Rehousing), and AD-TLS-N-006 (Avalon – Time Limited Subsidies - Winter Shelter), among other contracts.

d. Funding under some of these contracts was limited to a single fiscal year, while others spanned multiple fiscal years. For example, LAHSA provided funding for Alondra Park under AD-CH-AWS-003 for fiscal year 2021-22 only, while funding

for Avalon under AD-CH-CH-052 was provided for fiscal years 2021-22, 2022-23, 2023-24, 2024-25, and 2025-26.

e. In some instances, and at certain points, HAL had multiple contracts related to a single site. For example, HAL's funding for the Avalon site included funding from multiple contracts, including AD-BH-BH-035, AD-CH-CH-052, AD-TLS-N-006, and AD-PD-PS-050 (which all ran for different periods), and the billing for this site was allocated across these contracts, to the extent and when they were in place. Similarly, HAL had multiple contracts related to the Matrix site, including AD-BH-RIH-013 and AD-CH-WS-021. Conversely, in at least one contract, AD-CH-WS-004, LAHSA provided HAL with funding for multiple sites – Vermont and Western.

f. The funding for these contracts came from a variety of sources, including programs funded and administered by the City, the County, and the United States Department of Housing and Urban Development ("HUD"), and the contracts related to different types of homeless housing programs sponsored and administered by these public entities, such as Bridge Housing (e.g., housing for formerly incarcerated individuals), Crisis Housing (e.g., housing for domestic violence victims), and Winter Shelter (e.g., housing during winter months).

g. According to bank records, between January 2019 to April 2026, LAHSA paid HAL approximately $75,831,581 for homeless housing services pursuant to the contracts referenced above and additional contracts dating back to fiscal year 2019-20.

h. HAL separately contracted with the County to provide additional homeless housing and supportive services, including services at the following sites, among others: The Lotus (Paloma), 1426 Paloma Street, Los Angeles, CA 90021 ("Lotus"); the Infinity (Western), 5533 South Western Avenue, Los Angeles, CA 90062 ("Infinity"); and the Manchester site. The funding for these sites was in addition to the funding HAL received from its contracts with LAHSA.

i. According to bank records, HAL received approximately $29,498,500 from the County between November 2021 to July 2026, an additional approximately $10.5 million from another homeless housing grantor called Shine BC LA between July 2019 and July 2022, and more than $2.4 million more from Special Service for Groups, Inc. ("SSG") (another homeless housing grantor responsible for administering large amounts of grant money for LAHSA, the City, County, and HUD) between November 2018 and June 2024 – for a total of more than $118 million in public funding for homeless housing services since 2019.

17. According to additional LAHSA records and information obtained from LAHSA:

a. HAL received funding under its contracts from LAHSA pursuant to monthly advance and reimbursement requests HAL submitted through an online system LAHSA maintained for its grantees.

b. To obtain payment, HAL submitted – for each reimbursement request and under each contract – a general ledger specific to each contract (which is essentially a statement of

expenses incurred under that contract), summarizing information on various accounting categories and then details concerning each line-item expense. The ledger included information concerning each expense, broken down for each month and each contract, and then further broken down into various accounting categories (such as 7100-Salaries & Related Expenses, 7520-Facility Expenses: Janitorial Services, 7610-Food Services, 7740-Security), and then finally broken down by individual line-item expense with a brief description of each expense.[1]

c. For example, for November and December 2023, reimbursement requests were submitted for services HAL was supposed to be providing at the Avalon, Matrix, Evolve, and LIV sites. For the Avalon site, reimbursement requests were submitted under (at least) two different contracts, AD-BH-BH-035 and AD-CH-CH-052. Under these contracts, the total requested reimbursement for November 2023 was $124,144, submitted through two reimbursement requests labeled RR-BH-BH-035-032 ($68,775) and RR-CH-CH-052-032 ($55,369). A single general ledger and profit & loss statement was attached to both reimbursement requests, and these documents detailed among other expenses: $32,400 to SABLE supposedly for food services for 90 clients at the Avalon site and $7,500 to BLEU DIAMOND supposedly for janitorial services at this site. Similarly, for December 2023,

[1] LAHSA records indicate an accounting firm called Integrity Accounting Solutions ("IAS") submitted advance and reimbursement requests on HAL's behalf, and interviews with IAS staff and documents obtained from IAS confirms the reimbursement requests were submitted at YOUNG's direction and the direction of others working with and for him at HAL.

the total submitted was $132,202, which was submitted through reimbursement requests labeled RR-BH-BH-035-033 ($72,843) and RR-CH-CH-052-033 ($59,359). A single general ledger and profit & loss statement was again submitted detailing among other expenses: $33,480 to SABLE supposedly for food services for 90 clients at the Avalon site and $7,500 to BLEU DIAMOND supposedly for janitorial services.

d. For the Matrix site, reimbursement requests were also submitted under (at least) two different contracts, AD-BH-RIH-013 and AD-CH-WS-021. Under these contracts, the total requested reimbursement for November 2023 was $272,331, submitted through RR-BH-RIH-013-032 ($205,508) and RR-CH-WS-021-001 ($66,823). Two different ledgers and Profit and Loss Statements ("P&Ls") were submitted with these reimbursement requests, and these documents detailed among other expenses: $72,000 to SABLE supposedly for food services for 200 clients ($54,000 for 150 clients at the Matrix – from RR-BH-RIH-013-032 + $18,000 for 50 clients also at the Matrix – from RR-CH-WS-021-001); and $21,078.91 (from $18,719.21 in RR-BH-RIH-013-032 + $2,359.70 in RR-CH-WS-021-001) to BLEU DIAMOND supposedly for janitorial services. The total submitted for this location in December 2023 was $324,673, through RR-BH-RIH-013-033 ($267,140) and RR-CH-WS-021-004 ($57,533). Two different ledgers and P&Ls were submitted with these requests detailing, among other expenses: $74,400 to SABLE supposedly for food services for 200 clients ($55,800 for 150 clients – from RR-BH-RIH-013-033 + $18,600 for 50 clients – from RR-CH-WS-021-004); $21,075 to BLEU

DIAMOND supposedly for janitorial services (from RR-BH-RIH-013-033 only).

e. For the Evolve site, reimbursement requests were submitted under AD-BH-RIH-004, with a total of $246,582 submitted for November 2023 through request number RR-BH-RIH-004-030, including $52,560 to SABLE for food for 146 clients, and $16,000 to BLEU DIAMOND for janitorial services, and a total of $195,422 submitted for December 2023, including $54,312 to SABLE for food for 146 clients, and $16,000 to BLEU DIAMOND for janitorial services.

f. For the LIV site, reimbursement requests were submitted under AD-BH-RIH-012, with a total of $24,758 submitted for November through request RR-BH-RIH-012-048, including $9,000 to SABLE for food for 25 clients, and $3,000 to BLEU DIAMOND for janitorial services, and with a total of $37,375 submitted for December 2023 through request RR-BH-RIH-012-041, including $9,300 to SABLE for food for 25 clients and $3,000 to BLEU DIAMOND for janitorial services.[2]

---

[2] In November and December 2023, an additional $600 each month was billed to the Matrix contracts for janitorial services related to payments to an individual with the initials M.J., and agents have reason to believe, from bank records and otherwise, M.J. was providing childcare, cleaning, and other services for YOUNG and his wife, including finding workers to provide cleaning services at HAL's sites for a small fraction of the costs being billed to LAHSA. That is, between 2019 and 2025, HAL billed LAHSA for more than $2 million for janitorial services supposedly being provided by BLEU DIAMOND, but bank records show the money transferred to BLEU DIAMOND was not used for this purpose. Instead, the money was – like money sent to SABLE – withdrawn in cash and used for personal expenses and for businesses expenses unrelated to homeless housing. At the same time, a sizeable amount, approximately $700,000, was transferred

*(footnote cont'd on next page)*

g. Thus, for November 2023, approximately $165,960 was billed to LAHSA for SABLE services supposedly for catering services to approximately 461 clients across four sites, which would have required the preparation and delivery of 1,383 meals per day (three meals per day), or 41,490 meals for November. Likewise, for December 2023, approximately $171,492 was billed to LAHSA for these catering services, in billings that represented SABLE prepared and delivered approximately 42,842 meals in December 2023 for these four sites (the difference being the number of days in November and December). At the time, SABLE did not have a bank account (or at least not one agents have been able to identify through extensive investigation), and HAL was not paying any money to any entity of that name.

h. According to bank records, in January 2024, a bank account in SABLE's name was set up with Bank of America N.A. ("BofA"), account number ending x7990 (the "SABLE BofA account" or "SABLE account"); a likely co-conspirator, CC-1, and T.N. were the signers on the account. In May 2024, transfers into this account began from an account in HAL's name at Wells Fargo Bank ending x4917 (the "HAL WF account"); YOUNG and his

from YOUNG-affiliated bank accounts (including BLEU DIAMOND accounts) to M.J., who was withdrawing the money in cash and not reporting it as income in tax returns. I interviewed M.J. in April 2026, and she reported she worked for YOUNG and his wife primarily taking care of their children, and at YOUNG's direction, at least in part, she was making cash withdrawals from money transferred to her from HAL and BLEU DIAMOND to pay workers to provide cleaning services at HAL sites - looking particularly for people who could be paid in cash (potentially for less than minimum wage), under the table, without reporting the payments to tax authorities.

wife were the only signers on this account. In total, starting in May 2024 and continuing until at least July 2026, more than $5.9 million was transferred into the SABLE BofA account from accounts held by HAL. And in total, HAL billed LAHSA for approximately $4,517,472 for catering services supposedly being provided by SABLE between November 2023 and June 2026.

i. Even after HAL transferred money to SABLE, only a small fraction was spent on anything food related. For example, in May 2024 (a month for which LAHSA was billed approximately $253,000 for catering services supposedly provided by SABLE), more than $373,000 was transferred from the HAL WF account to the SABLE BofA account, but only about $34,000 of this was spent on anything food related (in transfers to Restaurant Depot and another food wholesaler). And no transfers this month appear to be related to food preparation or delivery – e.g., there are no transfers to a commercial kitchen or payroll to staff to prepare and deliver meals. Thus, the financials alone suggest SABLE could not have been preparing and delivering more than 40,000 meals to HAL sites.

j. Evidence similarly indicates the billings for BLEU DIAMOND were fraudulent. Among other evidence, bank records for BLEU DIAMOND and another likely co-conspirator ("CC-2") (who is the supposed owner of BLEU DIAMOND) indicate the money transferred from HAL to BLEU DIAMOND was not being used for janitorial services, and instead a large portion was withdrawn in large cash withdrawals, many of which appear structured to evade bank reporting requirements (and banks where

cash withdrawals were made were suspiciously close to YOUNG's residence and business addresses), and additional amounts were transferred from BLEU DIAMOND and CC-2 accounts to YOUNG affiliates.

k. In total, between May 2020 and July 2026, more than $3.3 million was transferred from the HAL WF account to accounts associated with BLEU DIAMOND and CC-2, and HAL billed LAHSA approximately $2,089,585 for janitorial services BLEU DIAMOND supposedly provided at HAL sites. But of the more than $3.3 million transferred from HAL to BLEU DIAMOND and CC-2 accounts, more than $1.5 million in cash was withdrawn from those accounts, and additional amounts were transferred to and from SOUL FOOD SHACK (a restaurant owned by YOUNG), C&C CATERING, and other YOUNG affiliates.

l. None of the money transferred from HAL to the BLEU DIAMOND and CC-2 accounts was spent on anything that appears related to legitimate janitorial services (cash withdrawals and Zelle payments could have been used to pay workers for cleaning services, but the financial activity does not resemble activity that would be expected for a legitimate cleaning company).

i. For November 2023, for example, as discussed above, LAHSA was billed approximately $47,578.91 for payments supposedly made to BLEU DIAMOND for janitorial services at the Avalon, Matrix, Evolve, and LIV sites. That month, approximately $40,500 was transferred from HAL to a bank account

maintained in the name of BLEU DIAMOND at WF, ending x0473 (the "BD WF account"); CC-2 is the only signatory on this account.

ii. For December 2023, LAHSA was billed approximately $47,575 for BLEU DIAMOND janitorial services, and approximately $78,575 was transferred from HAL to the BD WF account. Rather than being used to pay payroll or other expenses that would normally be associated with a legitimate business, this money was instead withdrawn in cash – with approximately $41,939 withdrawn in cash between November 8, 2023, and December 28, 2023, and otherwise used for what appear to be personal expenses (such as thousands of dollars for credit cards in CC-2's name and $6,548.10 at Alexander McQueen, a luxury men's clothing retailer) or Zelle payments to associates.

iii. Although none of the money transferred from HAL to BLEU DIAMOND appears to have been spent on anything resembling legitimate janitorial services, approximately $452,928 was transferred from BLEU DIAMOND and CC-2 accounts to an individual with the initials M.J.,[3] and an additional $121,578 was sent to M.J. from accounts in HAL's name, and yet another $207,612 was sent to M.J. from C&C CATERING accounts, and as discussed above in footnote 2, M.J. has been interviewed and reported she worked for YOUNG and his wife, and YOUNG asked her to withdraw cash and find workers willing to clean HAL sites in

[3] M.J. does not have legal immigration status in the United States and could be incentivized to cooperate with law enforcement to avoid being referred to immigration authorities or otherwise to try to stay in the country.

exchange for cash (which appears to have been paid under the table and without reporting the payments to taxing authorities).

### B. Additional Evidence of Fraudulent Billing In SABLE's Name

18. Additional evidence indicates YOUNG, with the likely assistance of CC-1 and potentially others, submitted fraudulent billing requests to LAHSA for services supposedly provided by SABLE. For example, LAHSA records indicate the following:

a. As stated above, between November 2023 and June 2026, HAL billed LAHSA approximately $4,517,472 for catering services SABLE supposedly provided at HAL's sites.

b. As part of LAHSA's annual monitoring efforts, LAHSA requested, and HAL provided, backup invoices and other backup documentation related to payments HAL reported having made to SABLE for catering services.

c. The additional backup documents include a document purporting to be responses to a RFP issued by HAL for catering at HAL sites. That is, LAHSA required HAL to obtain multiple bids from service providers for large contracts such as catering – to ensure HAL (and by extension LAHSA) was paying market price for such contracts, and as part of LAHSA's monitoring process, LAHSA obtained documentation of HAL's RFP process, soliciting bids from service providers for catering services. LAHSA required HAL to obtain at least three bids from what were supposed to be third party service providers. I know from my training and experience and work on this investigation that, in addition to attempting to ensure contractors are paying

market price for large reimbursable contracts, this formalized procurement process requiring contractors to issue RFPs and to obtain multiple outside bids for large contracts is also designed to try to avoid self-dealing, conflicts of interest, and the appearance of self-dealing or conflicts of interest, and to ensure a fair and open competition for large, publicly-funded contracts.

d. As part of LAHSA's monitoring, LAHSA asked HAL for documentation of this RFP process and the responses HAL received in response to it, and HAL provided purported documentation of its procurement process – the RFPs it supposedly issued for catering bids and responses it supposedly received from SABLE and others.

e. One of the bids HAL submitted supposedly from SABLE – which purported to be from 2023 – included a W-9 IRS form executed by T.N. The address listed was 6709 La Tijera Boulevard, Los Angeles, CA, which is the address of a commercial mail receiving company called Mail Connexion.

f. This RFP document (which is actually a compilation of documents) also includes a purported contract between SABLE and HAL – with T.N.'s name again used as the signatory for SABLE and YOUNG's wife's as the signatory for HAL. In this contract, SABLE's address was listed as 2052 Santa Fe Ave, Long Beach, CA 90810, which was, as of the date on the contract, a boarded-up retail space, which appeared to have formerly operated as a taco shop. That address was later associated with STRIPS N DIPS, another YOUNG business.

g. The RFP document compilation further includes an invoice purportedly issued from SABLE on December 30, 2023 (which was, as discussed above, before SABLE had a bank account). The address listed on the invoice is 2052 Santa Fe Avenue, Long Beach, CA 90810, the same address listed above, which was a boarded-up retail space. The invoice is directed to CC-1 at HAL, without any mention that CC-1 was also a SABLE associate, according to bank records.

h. The email address listed for SABLE on the invoice was: "[T.N.]sable@gmail.com," which appears on its face to be an email address for T.N. for SABLE. Google records indicate this Gmail account was created on April 14, 2024, at approximately 5:21 PM, Pacific Standard Time with the IP address 70.224.69.51. According to other LAHSA records, someone at HAL was printing documents to provide to LAHSA as part of its monitoring process on the same date and almost at the exact time the Gmail account was created. That is, certain documents HAL provided to LAHSA (including WF account records) show a print date and time of April 14, 2024, 5:23 PM. According to subscriber records from AT&T, 70.224.69.51 is an IP address issued by AT&T, registered to HAL at HAL's headquarters.

i. In that same RFP document compilation, and in a similar RFP document compilation for a different fiscal year, HAL provided LAHSA with additional procurement documents purporting to be bids HAL had supposedly obtained from SABLE, [J.B.]'s Catering, Taste of [P.], and others. I, along with IRS-CI special agents, interviewed the owners of [J.B.]'s

Catering and Taste of [P.], and they both reported the bids HAL submitted in the names of these companies were fake. According to the owners of these companies, they had never submitted bids to HAL for catering services and had no idea how their identities were stolen. The investigation has linked J.B. to YOUNG through YOUNG's mother, who worked for an organization called Bethel LA Community Development Corporation ("Bethel"), which had used J.B.'s company for catering services, although J.B. said that while he had done some catering business for Bethel, the bids and other documents that Bethel submitted supposedly from his company were also forgeries.

j. Another RFP document submitted to LAHSA as part of LAHSA's monitoring efforts purports to be a "Food Catering Proposal" from SABLE, dated June 17, 2024. In this document, it is represented that: "For over 15 years, Sable has partnered with shelters and community-based programs to provide consistent, high-quality meals tailored to resident needs." In a section titled "Why Sable Catering Services," it states: "Feature Benefit to Home At Last CDC, 15+ Years of Experience Extensive background serving shelters and community programs..." The document also lists three entities (Rainbow Services, Su Casa, and Women's & Children's Crisis Shelter) for whom SABLE purportedly provided food services; agents have contacted all three entities, and none has ever heard of SABLE. As of the date of the proposal, SABLE had no business history (a bank account was set up for SABLE a few months prior and HAL had just started transferring money to that account, but SABLE never

conducted business in its own name). Google had no record of the Gmail address listed for SABLE (Sablefoodservices@gmail.com), and the phone number listed for SABLE appears to be associated with completely unrelated individuals.

19. According to records from the California Employment Development Department ("EDD"), which administers the state's unemployment insurance system, and the Franchise Tax Board for the State of California ("FTB"), which is the state's taxing authority:

a. SABLE was not registered with EDD, and it did not report any payroll or pay payroll taxes.

b. Records from the FTB show no tax returns were ever filed for SABLE, and no income tax was ever paid. The Employer Identification Number listed on the W-9 provided to LAHSA was a real number registered with the IRS for this entity, but no tax returns were ever filed for this number. FTB sent a letter to the address filed for SABLE with CA SOS putting SABLE on notice of its withholding and other tax obligations, but again no returns were ever filed or taxes paid.

20. According to bank records:

a. CC-1 and T.N. are signers on the SABLE BofA account. In total between May 2024 and July 2026, more than $5.9 million was transferred from the HAL WF account to this account.

b. More than $260,000 in cash was withdrawn from this account, often in increments of $9,800, which is just below

the $10,000 threshold for IRS reporting requirements, suggesting the cash withdrawals were structured to evade those requirements, which is illegal under 31 U.S.C. § 5324.

c. For example, the following cash transactions occurred in the SABLE BofA account in July and August 2024:

July 3, 2024 - $9,800 cash withdrawal

July 5, 2024 - $9,800 cash withdrawal

July 9, 2024 - $9,800 cash withdrawal

August 29, 2024 - $9,800 cash withdrawal

August 30, 2024 - $9,800 cash withdrawal

d. In my training and experience, withdrawals structured in this way – which again is itself illegal – are often associated with other types of criminal activity, including but not limited to fraud and tax evasion.

e. Video surveillance footage from BofA shows an individual whom I recognize as CC-1 from her driver's license photo and from my observations of her during an in-person interview, as the person making at least some of the structured cash withdrawals from the SABLE BofA account.

f. Although T.N. is a signer on the account, I have not seen any evidence she accessed or used the account. In 2024, two payments totaling $5,500 were made to T.N. from this account, and in 2026, another $24,000 was transferred to T.N. from the SABLE BofA account, and there are other transfers to T.N. from other YOUNG-affiliated accounts, but I have seen no other evidence T.N. was using the SABLE BofA account, and as discussed below, T.N. confirmed she did not access the account.

g. SABLE never paid any payroll, and thus, it does not appear to have had any employees or employed anyone in a legal or legitimate way. At times, money was transferred through Zelle payments and otherwise from the SABLE BofA account to individuals for what may be work in a food-related business, but it appears these payments were not reported to taxing authorities through W-2 forms for employees or 1099 forms for contractors, or otherwise.

h. The SABLE BofA account was used for millions of dollars of what appear to be YOUNG's personal expenses, personal expenses of YOUNG's family members, and YOUNG's business ventures unrelated to homeless housing.

i. For example, the SABLE BofA account was used to make more than $290,000 in payments for travel, entertainment, and luxury retail purchases, including payments to: Saks Fifth Avenue in Bevely Hills, Fontainebleau Hotel in Las Vegas, The W Hotel in Atlanta, Delta Airlines, American Airlines, Alaska Airlines, Classic Vacations (a luxury travel agent used for the above-mentioned trip to Tahiti), Royal Caribbean Cruise Line, Crown Limousine, the Hollywood Bowl, StubHub (an event ticket retailer), Best Buy, and the Rise Gym (a children's gymnastic gym in Hawthorne – near YOUNG's residence). At least some of these payments have already been traced to YOUNG and his family.

j. Information from Classic Vacations indicates YOUNG used money from the SABLE BofA account to pay for a 5-night stay at the InterContinental Tahiti Resort & Spa for himself and his family including his wife and children, his

mother, another relative, and CC-1. A picture of that resort is below:



k. In addition to the personal expenses discussed in the previous subparagraph, more than $140,000 was transferred from the SABLE BofA account pay MK Garage Inc., which is a vehicle shop in Gardena specializing in classic Chevrolet Impalas made prior to 1970. According to information from this business, YOUNG made these payments for upgrades to his vintage Impala discussed above and pictured below:



l. More than $1 million in payments were made from the SABLE account for business expenses related to the opening and operation of the SIX SEVEN FIVE LOUNGE, which (as discussed

above) is a restaurant and nightclub that YOUNG opened and operates in Inglewood. Pictures of that business are below:





m. Among other payments that appear to be related to this business are approximately $577,766 in payments made to "Franklin Studios," which is a boutique architecture and interior design firm, and which is the firm that designed and built SIX SEVEN FIVE LOUNGE, according to the firm's own website.

n. Payments to Franklin Studios were also made from other YOUNG-affiliated accounts, but the SABLE BofA account is the largest contributor of Franklin Studios funding. Franklin Studios was also partnering with YOUNG to build a new building at 7811 S Western Avenue, Los Angeles, CA 90047. According to documents filed with the Los Angeles City Planning Commission, YOUNG applied to build a four-story building with 19 apartments that he was planning to operate as affordable housing on the site, with Franklin Studios listed as the architecture firm for the project.

o. Other payments that appear related to the operation of SIX SEVEN FIVE LOUNGE include payments totaling

approximately $378,197 made to LA BREA SPRUCE LLC, the owner of the lot where SIX SEVEN FIVE LOUNGE is located, and a payment of approximately $126,155 that has been traced through an escrow account and was used to purchase a liquor license for the business.

p. More than $429,000 of payments were made from the SABLE BofA account for construction and development type expenses that appear related to the SIX SEVEN FIVE LOUNGE or YOUNG's other business ventures and properties unrelated to homeless housing – such as approximately $23,594.06 paid to Amco Fixtures Seating, which was used for seating installed in SIX SEVEN FIVE LOUNGE.

q. Another approximately $402,323.97 was paid to a mortgage lender to pay and then pay off a loan on a property located at 9219 S Central Avenue, Los Angeles, CA 90002, which YOUNG owns through one of his affiliated companies, B C Arrington LLC.

r. An additional approximately $118,100 was paid to the then-owner and seller of 124-128 N Market Street, Inglewood, CA 90301 (the "Market Street property"). Evidence that these payments benefited YOUNG includes:

i. YOUNG purchased the Market Street property from the prior owner in May 2025, through a loan from the United States Small Business Administration ("SBA") and possibly a seller carryback loan with the seller. YOUNG purchased the property in his own name (as a married man, as his sole and

separate property), with guarantees for the SBA loan from at least two of his businesses, STRIPS N DIPS and HALO CONSULTING.

ii. YOUNG has operated restaurants at the Market Street property since at least 2022, including SOUL FOOD SHACK and STRIPS N DIPS.

iii. The timing of the payments to the prior owner and seller of the Market Street property suggests the money was for rent on the property before YOUNG purchased it or for mortgage payments on a seller carryback loan YOUNG obtained as part of the property acquisition financing.

s. An additional $20,000 wire was sent from the SABLE BofA account to SOUL FOOD SHACK.

t. In addition to the payments detailed above, another approximately $1.7 million from this account was paid to three wholesale food distributor and restaurant suppliers: Restaurant Depot, Sysco Corporation, and Lawrence Wholesale. Notwithstanding these payments, none of these entities has any record of ever having done business with SABLE.

u. Some or all of the money transferred from the SABLE BofA account to restaurant wholesalers may have been used to feed homeless housing participants at HAL sites (possibly with other money from other YOUNG-affiliated accounts), but the vast majority of the more than $5.9 million transferred to the SABLE BofA account was used for YOUNG’s personal expenses and other unrelated business ventures.

21. As mentioned above, SABLE was set up in the names of T.N. and CC-1, according to the CA SOS and bank records. In

April 2026, law enforcement interviewed T.N.; this interview was surreptitiously recorded. According to the transcript of this interview, T.N. reported the following:

a. T.N. was not involved with SABLE other than the initial formation of the company. YOUNG was T.N.'s godfather, and the business had been set up at his direction or with his guidance. T.N. thought it might have been set up to be an umbrella company for YOUNG's other businesses including catering. But T.N. was not involved in the business other than the initial set up. T.N. was not aware it was even an operating business or ever got off the ground.

b. T.N. opened a bank account in SABLE's name with CC-1 (whom T.N. knew by CC-1's name; T.N. is not believed to have knowingly conspired with CC-1 or to have viewed CC-1 as a co-conspirator), but T.N. did not access the account after it was opened. She was living in Ohio at the time, and agents confirmed her involvement was limited to having her name listed on documents.

c. Agents showed T.N. a contract between SABLE and HAL for food services, with what purported to be her signature on the document. The contract was purportedly signed on November 1, 2023, by T.N. using a digital signature, and it listed T.N. as SABLE's owner. T.N. reported that she did not know anything about this contract, and that she did not give anyone permission to sign contracts on her behalf.

d. Agents also showed T.N. a purported invoice from SABLE to HAL issued on December 31, 2023, in the amount of

$18,600, listing SABLE's contact information as [T.N.]sable@gmail.com. T.N. said that she did not recognize the invoice nor did she recognize the email address.

22. Additional evidence obtained through search warrants executed at HAL's headquarters, YOUNG's residence, and other locations, including information obtained from digital devices associated with YOUNG, shows YOUNG had access to the SABLE BofA account (as well as having possession of or access to a phone YOUNG and others obtained for SABLE to be used for, among other things, dual authentication to access the SABLE BofA account), and YOUNG directed CC-1 to use a bank card in SABLE's name for certain expenses that appear to be related to SIX SEVEN FIVE LOUNGE.

23. In September 2026, I interviewed D.S. along with other investigators, and he reported as follows:

a. D.S. was an outside accountant functioning as HAL's CFO and otherwise providing financial consulting to YOUNG and his wife.

b. Among other roles he performed for HAL, he assisted HAL in obtaining an annual audit by an outside auditor.

c. In 2025, the outside auditor HAL had retained was asking questions about a large outstanding accounts payable figure – more than $1.4 million – HAL was showing for SABLE, and the auditor asked if SABLE was a related party company, affiliated in any way with YOUNG or HAL.

d. Specifically, the auditor sent D.S. the following email:

> Attached please find the invoices, maybe from your system, from Sable Enterprises LLC for the last part of 2024. Can you provide the backup for each of these invoices?
>
> There is no detail as to how many meals, dates or any thing to support this level of expense.
>
> Also, please provide any contacts that the organization may have with this vendor. This would include any rates for services.
>
> The balance due to the company is $1,478,252 as on June 1, 2025.
>
> Additionally, can you provide a detail of all payments made subsequent to the year end.
>
> Is this company related to Home at Last – directly or indirectly?

e. D.S. spoke with YOUNG about the large outstanding SABLE payable, and YOUNG told him "they" had always been very accommodating in "their" billing. YOUNG never mentioned he or anyone else at HAL were affiliated with SABLE, and in part as a result of this conversation, D.S. responded (copying YOUNG and others) that SABLE "is not a related entity of HAL. [YOUNG's wife] is now the [Executive Director] for HAL. The rest of the questions I will have to defer to Michael [YOUNG]."

f. Following these representations, and because of concerns of fraud being carried out through SABLE (and thus the inability of the auditor to issue a clean audit), the auditor resigned from the HAL engagement.

24. In sum, and per the evidence discussed above, it appears SABLE did not operate as a real company (which would have paid payroll, payroll taxes, filed tax returns, and paid income tax, and would have had customers and clients other than

HAL and otherwise conducted business in its own name), and instead was a front for YOUNG's sham vendor fraud – making it appear HAL was obtaining legitimate catering services from an independent third-party caterer, when in reality SABLE was a secretly-affiliated sham company (which YOUNG was lying about), and it was used to try to justify more than $4.5 million in fraudulent billing.

### C. Additional Evidence of Fraudulent Billing in BLEU DIAMOND's Name

25. According to CA SOS records, BLEU DIAMOND is associated with another likely co-conspirator, CC-2. In CA SOS filings, CC-2 is listed as the CEO of BLEU DIAMOND (and YOUNG's mother is listed as the CFO).

26. LAHSA records indicate HAL billed approximately $2,089,585 for services supposedly provided by BLEU DIAMOND between July 2021 and June 2026.

27. According to LAHSA records, HAL provided a response to an RFP for janitorial services that included a purported bid from BLEU DIAMOND. The address listed in the bid for BLEU DIAMOND was 171 N. La Brea Avenue, Suite 212, Inglewood, CA 90301, but from a review of Google photos of this site, it appears no business of that name occupied that retail space – at that time or any other.

a. One of the other bids purportedly submitted by third party vendors was from Lilly Maids. In July 2026, I interviewed the owner of Lilly Maids, and she reported that the bid was fake. She never worked for HAL and had never heard of

them. She did not submit a bid to do work for them, and she did not prepare the document that was supposedly from her company. The company was no longer in operation at the time the bid was supposed to have been submitted - she had shut down the business in 2015 or 2016, and the bid was supposed to have been submitted in 2019. The phone number listed on the document was her phone number, and the email address was an address she had previously used, but she had not been the one to prepare the document and did not know how her identity had been stolen.

28. According to records from EDD and FTB:

a. BLEU DIAMOND was not registered with EDD, and it did not report any payroll or pay payroll taxes.

b. Records from FTB indicate, in September 2024, CC-2 filed tax returns for BLEU DIAMOND for 2020, 2021, 2022, and 2023 – all at the same time, and all reporting exactly $0 in income. At the same time, CC-2 filed personal income tax returns for 2019 and 2021, claiming, for each year, less than $10,000 in taxable income, and seeking a refund of over $11,381. These filings followed numerous notices of delinquencies and tax liens for amounts owed for previous tax years. FTB has continued to send CC-2 numerous tax delinquency letters through at least September 2024. Agents have seen no evidence of tax returns filed for BLEU DIAMOND or CC-2 for other tax years.

29. According to bank records and records from LAHSA:

a. CC-2 is the only signer on accounts in BLEU DIAMOND's name including the BD WF account and an account at US Bank, ending x5764 (the "BD US account"). CC-2 was also the

only signer on an account in his own name at US Bank, ending x1463 (the "CC-2 US account," collectively with the BD WF account and the BD US account the "BLEU DIAMOND accounts").

b. Between February 2020 and August 2023, approximately $1,142,169 was transferred from HAL to the BD US account, and an additional $20,000 was transferred from CBEP (another YOUNG affiliate owned by YOUNG's childhood friend C.B.), for a total of $1,162,169. An additional $158,000 was transferred from HAL to the CC-2 US account, and additional amounts were transferred to the CC-2 US account from other YOUNG affiliates including: $16,000 from YOUNG, $1,200 from HALO CONSULTING (again, another YOUNG-affiliated business), $8,750 from C&C CATERING, approximately $89,645 from CBEP (net incoming and outgoing of numerous transactions with CBEP), and approximately $18,407 from C.B. (net incoming and outgoing of numerous transactions with C.B.) – for a total of $1,454,171 from YOUNG affiliates to the BLEU DIAMOND accounts between February 2020 and August 2023.

c. LAHSA records indicate HAL was billing LAHSA anywhere between $6,000 and $62,000 a month for BLEU DIAMOND janitorial services (totaling more than $2 million from July 2021 to June 2026), and the money being transferred to the BLEU DIAMOND accounts made it appear HAL was paying BLEU DIAMOND for such services.

d. The money was not, however, used for anything resembling a legitimate janitorial company, but rather was mostly withdrawn in large, structured cash withdrawals, totaling

approximately $1,280,546 from the BD US account and CC-2 US account between 2020 and 2023, when the accounts were closed. The BD US account was also used to pay what appear to be personal expenses, including approximately $11,963 in spending on consumer goods and services and $11,659 to Toyota for car lease payments.

e. Between August 2023 and March 2026, approximately $1,766,935 was transferred from HAL to the BD WF account. Additional amounts were transferred to this account from YOUNG affiliates including $900 from YOUNG himself (from a personal account in his name), $1,300 from CBEP, and $31,575 from 2108 CULLIVAN STREET LLC, which is yet another one of YOUNG's businesses, for a total of approximately $1,800,710 from YOUNG affiliates. But again, none of this money was used for anything resembling a legitimate janitorial business. Instead, large amounts were again withdrawn in cash, including approximately $355,415 in cash withdrawals from this account between 2020 and March 2026, in addition to the approximately $1,280,546 withdrawn from the other BLEU DIAMOND accounts, for a total of approximately $1,635,962 in cash withdrawn from the BLEU DIAMOND accounts.

f. The structured withdrawals from this account include:

October 15, 2024 – $6,000 cash withdrawal

October 17, 2024 – $2,000 cash withdrawal

October 21, 2024 – $7,000 cash withdrawal

October 22, 2024 – $2,000 cash withdrawal

October 24, 2024 – $8,000 cash withdrawal

November 7, 2024 – $8,000 cash withdrawal

November 26, 2024 – $8,500 cash withdrawal

December 5, 2024 – $2,000 cash withdrawal

December 31, 2024 – $2,000 cash withdrawal

g. Since October 2025, the cash withdrawals from the BD WF account total more than $40,000, and nearly all of these withdrawals were made within two miles of YOUNG's residence (on South Sycamore Ave, Los Angeles CA – near 3480 S La Brea Ave – see below), HAL headquarters (5875 Green Valley Circle, Culver City, CA – near 5899 Green Valley Circle), SIX SEVEN FIVE LOUNGE (675 S. La Brea, Inglewood, CA – near 3883 W. Century Blvd), and the Market Street property discussed above (near 400 S Market Street).

h. Suspicious financial activity in the BD WF account further includes more than $400,000 in payments for personal expenses including hundreds of thousands of dollars in payments to credit cards in CC-2's name, $33,000 in purchases from jewelry stores, thousands of dollars for Clippers basketball tickets, thousands of dollars at retailers such as Neiman Marcus in Beverly Hills, and a monthly Volkswagen/Audi payment (agents have observed CC-2 driving an Audi SUV).

i. Additional items under investigation include a $22,000 wire to LA BREA SPRUCE LLC (which is the owner of the property where SIX SEVEN FIVE LOUNGE is located), approximately $278,928 in checks (with no memo line) to M.J., $224,000 in

wires to M.J.,[4] $42,000 in payments to D.W. (affiliated with SOUL FOOD SHACK), and $30,000 to SOUL FOOD SHACK.

j. Agents have identified no payments that appear to be payroll related (no payments to any payroll companies nor any weekly or otherwise recurring payments to employees) from any of the BLEU DIAMOND accounts, and again no payroll was reported to EDD or payroll taxes paid for BLEU DIAMOND.

**D. Additional Evidence of Fraudulent Billing in C&C CATERING's Name**

30. Among other evidence of fraud involving C&C CATERING:

a. LAHSA records indicate HAL billed approximately $1,242,592 for C&C CATERING services between November 2022 and December 2023.

b. According to records from CA SOS, C&C CATERING is registered to C.J.

c. EDD records show C&C CATERING was registered with the EDD, but it reported wages for only Q2 2020 through Q4 2020, and then only $13,336 for Q2 2020, $30,239.36 for Q3 2020, and $11,995.83 for Q4 2020.

d. FTB has no record of any filing for C&C CATERING.

e. According to bank records, C&C CATERING received approximately $2,771,054 from HAL between 2018 and 2025.

[4] For the reasons stated above, there is reason to believe M.J. is performing childcare other services for YOUNG and his family, and more than $700,000 was transferred to M.J. from various HAL-affiliated accounts including BLEU DIAMOND accounts, and M.J. reported YOUNG instructed her to withdraw the money in cash and find workers willing to clean HAL sites in exchange for cash to be paid off the books and without reporting the payments to taxing authorities.

f. Bank records show approximately $289,179 in structured cash withdrawals from the C&C CATERING account, and an additional $213,533 in structured cash withdrawals from C.J. accounts, for a total of approximately $502,712.50 in cash withdrawals from accounts associated with C&C CATERING and C.J.

g. Bank records also show suspicious financial activity similar to the activity observed in the SABLE and BLEU DIAMOND accounts, including large payments to YOUNG and YOUNG-affiliated businesses, including: (1) approximately $100,000 for rent or mortgage or acquisition payments related to YOUNG's commercial properties; (2) approximately $37,516 in payments to YOUNG or his family; (3) approximately $431,380 in personal expenses (e.g., $24,013.17 to LA Stadium (SoFi Stadium), $17,372 to FantaSea Charters, $15,330 to Oscar's Designs – a jewelry retailer, $11,787.36 to Tesla, $6,071.88 to Alaska Air, $5,847 to Porsche, $4,426.78 to Delta Airline (tickets to Tahiti for YOUNG and his family), and $4,117.20 to Louis Vuitton); (4) $183,400 in payments to Ocean Properties / V.W., a HAL employee listed as HAL's Chairman of the Board in tax filings and as its CFO and Treasurer in CA SOS filings and bank and escrow documents.

31. In April 2026, agents interviewed C.J. in connection with a search of his residence; that interview was surreptitiously recorded. I have listened to the recording of that interview and created a transcript. In addition, I have also interviewed C.J. myself on multiple occasions between April

and September 2026, and from these sources, I know C.J. reported the following:

a. C.J. knew YOUNG through YOUNG's father, and they had known each other a long time. At some point C.J. had done some catering work on the side, through a company called C&C CATERING, catering small events, but he had never run a catering business full time, and he had not done any catering work at all in years.

b. YOUNG knew about his company, and at some point years ago, YOUNG approached C.J. about using the company's name, and they came up with an agreement where YOUNG would pay C.J. $3,000 per month for YOUNG to lease the C&C CATERING business from C.J.

c. C.J. had no idea YOUNG was using C&C CATERING to bill LAHSA for catering services that C&C CATERING was supposedly providing at HAL sites. C.J. would not have allowed his business to be used for that purpose as he understands it would be wrong and fraudulent for YOUNG to have represented C.J. was providing catering services at HAL sites. C.J. himself was not involved in providing any catering for meals at homeless housing sites, and again, he did not know his business was being used for this purpose.

d. C.J. reported his signature had been forged on several documents submitted to LAHSA related to C&C CATERING, and he had not known his name was going to be used at all in submissions to LAHSA. He did not prepare any of the bids supposedly submitted to HAL from C&C CATERING and did not give

anyone permission to use his name in those submissions (the bids list his name as the responsible party), and he did not sign the contract between HAL and C&C CATERING (which was submitted to LAHSA in support of the invoicing in C&C CATERING's name). He also did not give anyone permission to sign for him (his signature was forged on this document). Again, he had not known his name was going to be used in any submissions to LAHSA.

e. C.J. did know that his name was being used on the bank account that YOUNG was using for C&C CATERING, an account C.J. had opened and was the only signatory on, and he got his monthly $3,000 payment through cash withdrawals from this account – withdrawals he made after checking with YOUNG to ensure the account had sufficient funds. He received his $3,000 payment for most months, but not all, and sometimes he received only partial payment.

### E. Interstate Wires Were Used to Facilitate an Essential Part of the Fraud Scheme

32. According to LAHSA records and information obtained from LAHSA:

a. As discussed above, HAL received funding under its contracts from LAHSA pursuant to monthly advance and reimbursement requests HAL submitted through an online system LAHSA maintained for its grantees. LAHSA employees based in Los Angeles, CA, would review HAL's submissions.

b. For example, as referenced above, on December 13, 2023, HAL submitted a reimbursement request for $68,775, numbered RR-BH-BH-035-032, for services at the Avalon site. In

the submission, HAL requested reimbursement for thousands of dollars in services allegedly provided by SABLE ($20,092.22) and BLEU DIAMOND ($4,650.98) at the Avalon site in November 2023. Based on the evidence described above, this reimbursement request was materially false as SABLE and BLEU DIAMOND did not provide the listed services and and were effectively shell entities YOUNG used to divert public funds back to himself for his personal and business uses unrelated to homeless housing.

c. The investigation has shown LAHSA would not have approved payment of this reimbursement request had it known SABLE and BLEU DIAMOND were shell companies set up in the names of nominees to make it falsely appear these were third-party companies unrelated to HAL or YOUNG, when they were really just YOUNG affiliates he was billing and paying himself. Among other evidence of this, the LAHSA Contractor's Accounting Handbook (available at https://www.lahsa.org/documents?id=5384-exhibit-i-lahsa-contractor-s-accounting-handbook.pdf [last checked September 14, 2026], and which was in place in the relevant time according to LAHSA's website), has a rule specifically governing "Payments to Affiliated Organizations or Persons," and it states "Contractors shall not make payments to affiliated organizations or persons for program expenses (e.g., salaries, services etc..) that exceed the lower of actual cost or the reasonable cost for such expenses. The reasonable cost shall be the price that would be paid by one party to another when the parties are dealing at arm's length (fair market price)." The amounts being billed to LAHSA for SABLE and BLUE DIAMOND were far higher than

YOUNG's actual cost to provide the billed-for services (and likely higher than the market rate for these services).

d. In addition, interviews of LAHSA employees that conducted or oversaw LAHSA's monitoring efforts confirms LAHSA did not know SABLE for example was a related party company, and LAHSA would not have approved the billed for expenses had it known.

e. At the time LAHSA employees were interviewed about HAL, investigators did not know about all of the fake procurement documents that were submitted to LAHSA as part of LAHSA's monitoring efforts, but from my training and experience, and work on this and other homeless housing fraud investigations, I believe LAHSA would also have considered the submission of fake documents to be material to its decision on whether to continue to provide funding to a grant recipient.

f. The submission of fake procurement documents (and particularly fake bids from supposed competitors and forged signatures on contracts with the secretly-affiliated companies) also supports the conclusion that the prices HAL agreed to pay to the secretly-affiliated companies were not market rates or at the very least that those prices were not vetted through the required procurement process to ensure that they were competitive, market rates. The submission of fake documents and other misrepresentations to LAHSA about the ownership and operating history of the secretly-affiliated companies also tend to confirm that YOUNG himself understood the importance of

representations to LAHSA on these topics, otherwise why would he (or others working at his direction) lie to LAHSA about them.

33. Information provided by LAHSA and its vendors establishes that the reimbursement requests YOUNG caused to be submitted, including the reimbursement request submitted on December 13, 2023, involved the use of interstate wires. During the period at issue in this investigation, LAHSA used GovGrants Enterprise Grants Managements System ("EMGS"), a cloud-based proprietary software product owned and operated by REI Systems (REI), for the submission and processing of reimbursement requests and other payments requests submitted by grantees including HAL.

34. Based on information obtained from REI, I know that the GovGrants EGMS software is built on the cloud architecture maintained by Salesforce, Inc. ("Salesforce"), and that any submissions made through the GovGrants EGMS system would travel through Salesforce's cloud computer servers. Additionally, based on information provided by Salesforce, I know that the cloud computer servers used to process LAHSA submissions through the GovGrants EGMS system are located outside the state of California. Accordingly, the reimbursement requests YOUNG caused to be made through the GovGrants EGMS system, by necessity, involved the use of interstate wires, and these submissions were necessary to carry out an essential part of the scheme, that is, to obtain money from LAHSA through the false billing.

**F. Additional Evidence Obtained from Physical Search Warrants**

35. As discussed above, on April 10, 2026, the Honorable Patricia Donahue issued warrants to search HAL's headquarters, YOUNG's residence (which he shares with his wife and family) and residences of other subjects under investigation. These warrants were executed on April 13, 2026.

36. Consistent with the evidence described above of large cash withdrawals being made from bank accounts associated with secretly-affiliated vendors, agents found $118,595.38 in cash stashed throughout YOUNG's home, as shown in the images below:







37. Agents also found significant amounts of cash in CC-2's home, specifically a total of $19,172 in cash, including cash in a bag that also had CC-2's passport, social security card, keys, and credit card, and a cash-counting machine. This is consistent with more than a million dollars in cash withdrawals accounts associated with CC-2 and BLEU DIAMOND.





38. For all the reasons described above, I respectfully submit there is probable cause YOUNG committed a violation of 18 U.S.C. § 1343 (wire fraud) by causing the submission of an interstate wire on or about December 13, 2023, to execute the scheme to defraud described herein, through submitting a reimbursement request on behalf of HAL for approximately $68,775 for purported services at the Avalon site.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 14th day of September 2026.

HON. STEPHANIE S. CHRISTENSEN
UNITED STATES MAGISTRATE JUDGE